Approved: _____
MICHAEL K. KROUSE / MICHAEL D. LOCKARD
Assistant United States Attorneys

Before:   THE HONORABLE KEVIN NATHANIEL FOX
          United State Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - x

**20 MAG 8202**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **SEALED COMPLAINT** |
| - v. - | : | Violations of 50 U.S.C. § 4819; 18 |
| CHONG SIK YU, a/k/a "Chris Yu," and | : | U.S.C. §§ 1349, 1956 |
| YUNSEO LEE, | : | COUNTY OF OFFENSE: NEW YORK |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        SPECIAL AGENT STEPHAN SCHENKEL, being duly sworn, deposes and says that he is a Special Agent with the U.S. Department of Commerce (the "Commerce Department"), Office of Export Enforcement ("OEE"), and charges as follows:

<u>**COUNT ONE**</u>
(Conspiracy to Unlawfully Export Dual-Use Electronics Components)

        1.    From at least in or about 2019, up to and including in or about 2020, in the Southern District of New York and elsewhere, CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the Export Control Reform Act.

        2.    It was a part and an object of the conspiracy that CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, would and did agree to export and to cause to be exported from the United States items controlled

under Subchapter I of the Export Control Reform Act, to wit, electronic components, telecommunications components, and sensors, to Hong Kong and the People's Republic of China, without having first obtained a license for such export from the U.S. Department of Commerce, in violation of Title 50, United States Code, Section 4819(a)(2)(A), (B), (C), (D), (E), (F), and (G), and Title 15, Code of Federal Regulations, Section 736.2(b)(1).

(Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A), (B), (C), (D), (E), (F), & (G), and 4819(b), and 15 C.F.R. § 736.2(b)(1).)

## COUNT TWO
(Conspiracy to Commit Wire Fraud and Bank Fraud)

3.   From at least in or about 2019, up to and including in or about 2020, in the Southern District of New York and elsewhere, CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349.

4.   It was a part and an object of the conspiracy that CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, would and did devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, and pictures for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

5.   It was further a part and an object of the conspiracy that CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, would and did knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

**COUNT THREE**
(Conspiracy to Launder Money)

6. From at least in or about 2019, up to and including in or about 2020, in the Southern District of New York and elsewhere, CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other commit money laundering, in violation of Title 18, United States Code, Section 1956.

7. It was a part and an object of the conspiracy that CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and others known and unknown, would and did in an offense involving and affecting interstate and foreign commerce, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, conspiracy to commit wire fraud and bank fraud as charged in Count Two of this Complaint, in violation of Section 1956(a)(2)(A) of Title 18, United States Code.

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

8. I am a Special Agent with the OEE. In the course of my duties with the OEE, I received training in, and participated in, investigations of, among other things, violations of the U.S. export laws.

9. I have been personally involved in the investigation of this matter. This affidavit is based upon my own knowledge, my conversations with others, including other law enforcement agents, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview**

10.     Between at least in or about 2019 and in or about 2020, a company incorporated in the United States, America Techma Inc. ("ATI"), has illegally exported electronic components listed on the Commerce Control List from the United States to Hong Kong for apparent re-export to other countries, including the People's Republic of China ("PRC").  Among these electronic components were those that could make a significant contribution to the military potential of other nations, and that could be detrimental to the foreign policy or national security of the United States.

11.     CHONG SIK YU, a/k/a "Chris Yu," the defendant, is ATI's President, and YUNSEO LEE, the defendant, is an ATI Sales Representative.  YU and LEE worked together and with others to knowingly and willfully export controlled items to Hong Kong without obtaining the required licenses.  For instance, in January and April 2020, shipments sent by ATI to Hong Kong containing several different electronic components from the Commerce Control List were inspected and detained.  As explained in greater detail below, emails involving YU and LEE established that the defendants conspired, in connection with these shipments, to violate the laws prohibiting the export of these items without a license, and to commit, in furtherance of this criminal scheme, wire fraud, bank fraud, and money laundering.

**Background on the Export Control Reform Act**

12.     The Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4801 *et seq.*, provides, among its stated policy objectives, that the "national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled . . . ."  50 U.S.C. § 4811(2).  To that end, the ECRA grants the President the authority "(1) to control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information.  50 U.S.C. § 4812(b).  The ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

13.     Pursuant to that authority, the DOC reviews and controls the export of certain items, including goods, software,

4

and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774.  In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

     14.  The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at Title 15, Code of Federal Regulations, Part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export-control requirements depending on destination, end use, and end user. For example:

- ECCN 3A001 establishes export controls for certain electronics systems, equipment and components for reasons of national security, regional stability, missile technology, and anti-terrorism.

- ECCN 5A001 establishes export controls for certain telecommunications systems, equipment and components for reasons of national security and anti-terrorism.

- ECCN 6A002 establishes export controls for certain sensors and lasers systems, equipment and components for reasons of national security and anti-terrorism.

Pursuant to these ECCNs, the export of controlled items in these categories to Hong Kong and the PRC requires an export license from the Commerce Department, subject to certain exceptions that do not apply here.

     15.  Pursuant to Title 15, Code of Federal Regulations, Section 736.2(b)(1), a person "may not, without a license or License Exception, export any item subject to the EAR to another country or reexport any item of U.S.-origin if each of the following is true: (i) The item is controlled for a reason indicated in the applicable Export Control Classification Number (ECCN), and (ii) Export to the country of destination requires a license for the control reason as indicated on the Country Chart at part 738 of the EAR."

16.     Pursuant to Title 50, United States Code, Section 4819(a)(1), it is "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter."  Pursuant to Section 4819(b), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a)" is guilty of a crime.

### The Defendants' Unlawful Export Business

17.     Since in or about 2019, I and other law enforcement agents have been involved in an investigation into efforts by ATI to illegally export and cause the export of controlled items from the United States to Hong Kong for apparent re-export to other countries.  Based on my training and experience, I am aware that Hong Kong is a jurisdiction that is often used for the transshipment of components to other places, including the PRC.

18.     According to corporate records filed with the State of New Jersey Division of Revenue, ATI was incorporated in 1993, and CHONG SIK YU, a/k/a "Chris Yu," the defendant, is ATI's President.  ATI's principal business is the export of electronics equipment and components.

19.     According to records filed with the State of New Jersey Division of Revenue and account records from various financial institutions where ATI has accounts, ATI has also done business under the names "Novars Technology Inc." ("Novars") and "Entire Parts."

20.     I have reviewed emails obtained pursuant to judicially authorized search warrants from accounts controlled by CHONG SIK YU, a/k/a "Chris Yu," the defendant, YUNSEO LEE, the defendant, and other employees of ATI.  Based on my review, I have learned, among other things, that LEE is a Sales Representative for ATI. During at least 2019, LEE was located in South Korea while working for ATI.  Based on my review of travel records and emails, I have learned that, in or about early 2020, LEE relocated to the United States and continued working for ATI.

21.     On or about November 15, 2019, I and another law enforcement officer conducted an outreach meeting at ATI's offices in New Jersey, where I met with CHONG SIK YU, a/k/a "Chris Yu," the defendant, and another ATI representative.  At

that meeting, YU and the other ATI representative stated, in substance and in part, that ATI's business was approximately 80% export, mostly to South Korea, and that the company generally understood embargoes, sanctions, ECCN classifications, the Commerce Control List, end user statements, and other matters relating to U.S. export controls.

### *The June 2019 Transaction*

22. Based on my review of emails, financial records obtained from banks, records and information obtained from U.S. suppliers of electronics equipment and components, and conversations with other law enforcement agents and officers, I have learned, among other things, the following:

    a. In or about June 2019, ATI (doing business as Novars) obtained electronic components with the part number EV10AQ190AVTPY from a U.S. supplier of electronics equipment and components ("U.S. Supplier-1"). U.S. Supplier-1 classified this component as ECCN 3A001.a.5.a, which are export-controlled for reasons of military technology, nuclear nonproliferation, and anti-terrorism, and require a license for export to Hong Kong and the PRC.

    b. Based on my training, experience, and participation in this investigation, I am aware that, under U.S. export laws, U.S. suppliers of export-controlled equipment and components could face legal consequences for knowingly supplying export-controlled products to a company such as ATI that are intended to be exported without a required license. As a result, U.S. suppliers of export-controlled equipment and components typically do not sell equipment and components to a U.S.-based buyer like ATI if they know that the buyer intends to export the equipment or components in violation of U.S. export controls.

    c. On or about June 21, 2019, CHONG SIK YU, a/k/a "Chris Yu," the defendant, YUNSEO LEE, the defendant, and others received an email from a purchasing agent at a trading company located in Hong Kong ("Hong Kong Trading Company-1") concerning the purchase by Hong Kong Trading Company-1 of, among other things, the electronic components that ATI obtained from U.S. Supplier-1. The email stated, in part, that Hong Kong Trading Company-1 would send Electro-Static Discharge ("ESD") bags, which can be used to protect electronic components from damage from static discharge during storage or shipping, for "expensive or sensitive parts." The email went on to state, "Like this

7

item EV10AQ190AVTPY. It's expensive and high qty. So we need you to separate it into 4 packages. Paste new labels on each package."

        d.   On or about June 21, 2019, LEE replied to Hong Kong Trading Company-1, copying YU, stating, in part, that LEE understood the instruction and advising that the identified part "is very expensive . . . and total amount is about $60k."

        e.   On or about June 26, 2019, approximately $104,202 was transferred from an account held by Hong Kong Trading Company-1 in Hong Kong to an ATI account held at a U.S. financial institution ("U.S. Bank-1") in New York, New York. According to records from U.S. Bank-1, the funds were transferred from Hong Kong to U.S. Bank-1 through another U.S. financial institution ("U.S. Bank-2") in New York, New York. The deposits for U.S. Bank-1 and U.S. Bank-2 are insured by the Federal Deposit Insurance Corporation.

        f.   Based on my review of emails and bank records, it appears that ATI sent the controlled components obtained from U.S. Supplier-1 to Hong Kong Trading Company-1 in Hong Kong. I have consulted Commerce Department records regarding applications for export licenses, and there is no record of ATI or Hong Kong Trading Company-1 applying for a license to export this controlled component.

### *The January 2020 Detained Shipment*

    23.   Based on my review of emails obtained pursuant to judicially authorized search warrants, financial records obtained from banks, shipping records obtained from commercial shipping companies, and conversations with other law enforcement agents and officers, I have learned, among other things, the following:

        a.   On or about October 24, 2019, CHONG SIK YU, a/k/a "Chris Yu," the defendant, YUNSEO LEE, the defendant, and others received an email from a purchasing agent at Hong Kong Trading Company-1 concerning what appears to be another shipment. The email stated in part:

> As we mentioned in the last meeting, [s]ince the value of each packages are high, for safety of further shipments, we need some changes:

8

> 1. I will send you printed label, and ESD bags for the parts you will be shipping soon.
>
> 2. We need you to cover the original bag of each item with a new ESD bag. Then seal it and paste new label.
>
> 2. [sic] The part numbers on label, box and shipping invoice must be the same. We will tell you the exact part number that should be changed before shipping.

      b.    Based on my participation in this investigation, I understand the reference to "safety of further shipments," in connection with changing the original part numbers to part numbers supplied by Hong Kong Trading Company-1, to mean that the real part numbers of electronic components requiring an export license should be concealed in order to reduce the risk that the shipment would be delayed or intercepted by government authorities.

      c.    On or about January 16, 2020, I and other law enforcement officers conducted a border inspection of a shipment, see 15 C.F.R. § 758.7, containing boxes of components sent by ATI to Hong Kong Trading Company-1 in Hong Kong.  Based on my inspection, I learned, among other things, that the shipment contained components with:  ECCNs 3A001.a.2.c, which are export-controlled for reasons of military technology, nuclear nonproliferation, and anti-terrorism; 3A001.b.2.d, which are export-controlled for reasons of national security, regional stability, military technology, nuclear nonproliferation, and anti-terrorism; and 5A002.a, which are export-controlled for reasons of national security and anti-terrorism.  The export of these components to Hong Kong or the PRC requires a license from the Commerce Department.  Based on my review of Commerce Department records, there is no record of ATI or Hong Kong Trading Company-1 applying for a license in connection with this shipment.  Because the shipment contained export-controlled items for which no export license had been obtained, the shipment was detained.

      d.    YU, LEE, and employees of Hong Kong Trading Company-1 exchanged numerous emails about this shipment, both before and after the shipment was inspected and detained.  Those emails included the following:

          i.    On or about January 8, 2020, YU, LEE, and others received an email from a purchasing agent for Hong Kong

Trading Company-1 advising that Hong Kong Trading Company-1 had transferred approximately $125,888.05 to ATI as payment for the two purchase orders. The email requested, "Pls confirm and ship all the parts you have received today."

        ii.     That same day, January 8, 2020, LEE replied to Hong Kong Trading Company-1, copying YU, and instructing another ATI employee to release the parts to Hong Kong Trading Company-1.

        iii.     That same day, January 8, 2020, the other ATI employee replied to LEE, copying YU and Hong Kong Trading Company-1. The email listed the original part numbers in the order as well as the new part numbers that ATI had placed on the components.[1] Attached to this email were: (1) an invoice from ATI to Hong Kong Trading Company-1 for the components in the January 8, 2020 shipment, identified by the false part numbers provided by Hong Kong Trading Company-1; and (2) documentation ATI had received from the U.S. suppliers from whom ATI had purchased the items. The documentation from ATI's suppliers identified some of the components as having ECCNs 5A002, 3A001.a.2.c and 3A001.b.2.d. Some of the packing lists also included the warning, "PRIOR AUTHORIZATION FROM THE U.S. DEPARTMENT OF COMMERCE IS REQUIRED FOR EXPORT TO DESTINATIONS OUTSIDE OF COUNTRY OF DELIVERY."

        iv.     On or about January 13, 2020, after the shipment was diverted by the shipping company at the direction of law enforcement, but before I inspected and detained the shipment, YU, LEE, and others received an email from a representative of Hong Kong Trading Company-1 concerning the shipment. The email stated, in part, that as "we discuss early today with yunseo," Hong Kong Trading Company-1 had been advised by a representative of the shipping company that the package had been called back to redo the customs clearance. The email stated that Hong Kong Trading Company-1 expected that "its gonna be fine", but that, "for [s]afety concern," because some of the parts had not been relabeled with false part numbers, ATI should tell the shipping company that "you ship the [p]ackage to wrong person and have to call it back, can you do that immediately [and] once you receive it, let me know first before you ship

---

[1] The email advised that some of the components had not been placed in new ESD bags and relabeled, as requested by Hong Kong Trading Company-1, because there were too many items. Orders of two components that required an export license were not relabeled with false part numbers.

10

anything [o]ut."  Based on my participation in this investigation, I understand this instruction to mean that Hong Kong Trading Company-1 wanted ATI to lie to the shipping company and claim that the package had been sent to the wrong person, so that ATI and Hong Kong Trading Company-1 could evade law enforcement scrutiny by repackaging and reshipping the items at a later date.

        v.      On or about January 16, 2020, an ATI employee sent several emails to Hong Kong Trading Company-1, copying YU and LEE.  The emails advised that ATI asked the shipping company to return the shipment to ATI, but were informed that the shipment had been taken by U.S. officials to perform "an exam."  The ATI employee asked, "Btw [by the way], are [t]here any regulated parts that not allowed shipping to HK?"  In a later email that day, copied to YU and LEE, the ATI employee asked Hong Kong Trading Company-1 to provide End User applications and a description of the end use for the components, that is, the person or entity who ultimately would receive the components, and how that person or entity planned to use the components.

        vi.     On or about January 17, 2020, an ATI employee sent an email to Hong Kong Trading Company-1, copying YU and LEE, advising that:

> From now [o]n, we cannot use your printed label and totally different part [n]umber. Please [p]rovide us the applications of End User and we need to know the purposes of use and [f]igure out the excuse for the reason why we had to change the part [n]umber. They [h]aven't ask us anything yet, but we want to make sure and prepare everything for the [e]xcuse.

As described below, *see infra* ¶ 24.f, YU and LEE later agreed to follow Hong Kong Trading Company-1's instructions to remove labels and alter invoices in order to evade law enforcement scrutiny.

        vii.    On or about January 18, 2020, LEE sent an email to Hong Kong Trading Company-1, copying YU, advising that LEE and YU had spoken about the issue and "[i]t's kinda critical issue for us."  LEE asked if the End User identified by Hong Kong Trading Company-1 "is real," because "it doesnt make sense End [user] is in USA" because ATI had tried to ship the components to Hong Kong.  A representative of Hong Kong Trading

11

Company-1 replied, stating in part that there was "no [p]roblem to ship to HK" (Hong Kong) but asking ATI to find out what questions the shipping company had about the shipment, "let me know what it is, and we will discuss about it." Hong Kong Trading Company-1 instructed ATI to tell the shipping company that the "one responsible for the shipping is OOO" (out of office) and "you will reply once she (or he) [i]s back." The email from Hong Kong Trading Company-1 did not respond to ATI's questions about the end user for the components.

   viii. On or about January 19, 2020, a representative of Hong Kong Trading Company-1 sent an email to LEE and others stating, in part, that there were no Hong Kong customs restrictions on the import of the shipment. Based on my training and experience and my participation in this investigation, I understand that by claiming that Hong Kong customs law did not restrict importing the components, Hong Kong Trading Company-1 was indicating that the restrictions were based on U.S. law. Hong Kong Trading Company-1 repeated that ATI should find out what questions the shipping company had, tell the shipping company that the person responsible for the shipment was out of the office, and discuss the questions with Hong Kong Trading Company-1.

  e. On or about February 28, 2020, a representative of Hong Kong Trading Company-1 sent an email to LEE about another order for electronic components that Hong Kong Trading Company-1 had placed with ATI. The email stated, in part, that "I am concerning if your company's computer is been monitored by F... [ellipses in original]. That's why I wanted to talk with you by phone that night." Based on my training and experience and my participation in this investigation, I believe that Hong Kong Trading Company-1's reference to monitoring by "F..." was a shorthand reference to U.S. federal law enforcement.

### *Efforts to Avoid Law Enforcement Scrutiny*

 24. Based on my review of emails obtained pursuant to judicially authorized search warrants, and conversations with other law enforcement agents and officers, I have learned, among other things, the following:

  a. To avoid detection by U.S. customs and export officials, ATI began transshipping components though its office in South Korea. For example, on or about February 12, 2020, YUNSEO LEE, the defendant, sent an email to another ATI customer located in Hong Kong ("Hong Kong Company-2") stating, in part,

that "we had delivery issue currently with customs, so we've decided to release all items to South Korea first and release to HK from Korea temporarily." LEE also advised that "[y]our orders will be handled by me because I'm back in US office." On or about February 13, 2020, LEE received a reply from Hong Kong Company-2 stating, in part, "Most of the items we buy from ATI are under ECCN restriction, so I guess ATI will stock in and release to Entire, and then ship to HK . . . am I correct?" LEE replied, "Yes you are right." Based on my participation in this investigation, I understand Hong Kong Company-2's reference to "Entire" to mean ATI's office in South Korea, which I have learned does business as "Entire Parts."

      b.   On March 2, 2020, a representative of Hong Kong Trading Company-1 sent an email to CHONG SIK YU, a/k/a "Chris Yu," the defendant, LEE, and others with the following detailed instructions involving another company located in New Jersey (the "New Jersey Reshipper"):

> 1. Use marker to cover your company name on all the label.
>
> 2. Use new ESD bags to cover each parts.
>
> 3. [D]o not put any document in the box. Send all the doc by scanning.
>
> 4. Use two new boxes for below two batch of parts. (no label on the box)
>
> 5. [S]end to [the CEO of the New Jersey Reshipper] as earlier as you can. . . . Just tell [the CEO of the New Jersey Reshipper], the parts are for [Hong Kong Trading Company-1]. Do not mention anything else, including your company name and part numbers.

      c.   Hong Kong Trading Company-1 still expressed concern regarding the risk that U.S. officials would intercept its shipments of export-controlled items. On or about March 4, 2020, LEE, YU, and others received an email from a representative of Hong Kong Trading Company-1 asking if ATI would share in the monetary loss if another shipment was detained: "Can Chris give me his words for affording the loss together with me once if the parts were took again? It should be out both responsibility right?"

13

    d. On or about March 5, 2020, LEE replied to Hong Kong Trading Company-1, copying YU, stating, "[a]fter I had talked to Chris," ATI would not agree to bear the financial risk of shipments being detained.  LEE stated, in part, "We follow your direction as you want and it's not what we intend."  LEE further stated, "We have no idea how to handle all controlled items.  Does it any chance to make new warehouse or office in Europe?"  Based on my training and experience and my participation in this investigation, I understand LEE's question about establishing a location in Europe to relate to the possibility of using a European country as a transshipment location in order to evade export license requirements under U.S. law.

    e. On or about March 5, 2020, LEE sent an email to a representative of Hong Kong Company-2, copying YU, responding to Hong Kong Company-2's inquiry whether ATI could sell certain components to China.  LEE advised: "We've sold" the requested parts "to China customer many times. . . But currently we have customs issue so we don't know how to handle it. [W]e are thinking we release all controlled parts to South Korea first then release to HK from Korea, but it's just one of our idea."

    f. On or about March 14, 2020, LEE sent an email to Hong Kong Trading Company-1, copying YU, stating that although ATI had previously "decided to detour to South Korea office to release all package to HK," this method was more expensive because of fees and taxes incurred in South Korea and, as a result, "Chris and I've decided to release package from USA to HK directly."  LEE instructed: "We will follow your direction like adjusting invoice or removed label. But we do not have responsible if it will have problem during the transit to you. But for sure, we will do everything what you want for preparing shipments.  We just hope that there is no more detained package."  LEE advised that "[w]e also still detour to South Korea if these are really difficult to export HK."

### *The April 2020 Detained Shipment*

 25. Based on my review of emails obtained pursuant to judicially authorized search warrants, and conversations with other law enforcement agents and officers, I have learned, among other things, the following:

    a. On or about March 27, 2020, YU sent an email to LEE with a chart of ATI customers and part numbers for each

14

customer.  The chart identified six components, with corresponding quantities, for Hong Kong Trading Company-1.

  b. On or about March 30, 2020, CHONG SIK YU, a/k/a "Chris Yu," the defendant, YUNSEO LEE, the defendant, received an email from a representative of Hong Kong Trading Company-1 asking for updates on a shipment of three components, along with their quantities.  LEE replied the same day, copying YU, advising that ATI had two of the components and expected the third the following day.  Two of the components that Hong Kong Trading Company-1 asked about were also listed in YU's March 27, 2020 email.

  c. In April 2020, a package of components shipped by the New Jersey Reshipper to Hong Kong Trading Company-1 was inspected and detained by U.S. customs authorities.  Records of that inspection show that the shipment contained four components identified in YU's March 27, 2020 email and LEE's March 30, 2020 email.  As Hong Kong Trading Company-1 had directed, *see supra* ¶ 24.b, each of the components had been placed in ESD bags labelled with part numbers different from the actual part numbers.  One of the components was ECCN 6A002.a.3.g, which requires a license for export to Hong Kong.  Based on my review of Commerce Department records, there is no record of ATI, the New Jersey Reshipper, or Hong Kong Trading Company-1 applying for a license in connection with this shipment.

### *Records of Transactions*

 26. Based on my review of records from U.S. Bank-1, I have learned the following, in substance and in part:

  a. Between on or about May 29, 2019 and on or about June 17, 2020, Hong Kong Trading Company-1 made approximately 18 funds transfers, totaling approximately $809,238.20, to ATI's account at U.S. Bank-1.

  b. According to U.S. Bank-1, these international transfers from Hong Kong Trading Company-1's account in Hong Kong to ATI's account in the United States were processed through U.S. Bank-1's correspondent accounts in New York, New York.

  c. Based on my training and experience and my participation in this investigation, I am aware that U.S. financial institutions have sanctions compliance and anti-money laundering policies in place to detect financial transactions that may relate to violations of the United States export and

anti-money laundering laws.  My understanding is that a U.S. financial institution would not execute a funds transfer if the institution believed that the transfer related to potential violations of U.S. law.

   27.   Based on my review of records provided by FedEx, I have learned the following, in substance and in part:

         a.   Between on or about August 5, 2016 and on or about July 13, 2020, ATI shipped approximately 227 packages by FedEx to Hong Kong.  Approximately 211 of those shipments were sent to Hong Kong Trading Company-1 in Hong Kong.

         b.   Between on or about November 6, 2019 and on or about April 7, 2020, the New Jersey Reshipper shipped approximately 10 packages by FedEx to Hong Kong Trading Company-1 in Hong Kong.

         c.   Between on or about August 7, 2015 and on or about June 1, 2020, U.S. Supplier-1 and a subsidiary of U.S. Supplier-1 shipped approximately 260 packages by FedEx to ATI and Novars.

         d.   Between on or about July 16, 2015 and on or about May 22, 2020, another U.S. supplier of electronic components ("U.S. Supplier-2") shipped approximately 250 packages by FedEx to ATI and Novars.

         e.   Between in or about August 13, 2015 and in or about July 10, 2020, another U.S. supplier of electronic components ("U.S. Supplier-3") shipped approximately 114 packages by FedEx to ATI and Novars.

   28.   Based on my review of records provided by U.S. Supplier-1, U.S. Supplier-2, and U.S. Supplier-3, I have learned the following, in substance and in part:

         a.   Between in or about February 2019 and in or about December 2019, U.S. Supplier-1 shipped approximately 25 orders to ATI and Novars that contained controlled items.

         b.   Between in or about January 2019 and in or about January 2020, U.S. Supplier-2 shipped approximately 87 orders to ATI and Novars that contained controlled items.

         c.   Between in or about March 2019 and in or about April 2019, U.S. Supplier-3 shipped two orders to ATI and Novars that contained controlled items.

WHEREFORE, the deponent respectfully requests that warrants issue for the arrests of CHONG SIK YU, a/k/a "Chris Yu," and YUNSEO LEE, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

s/Stephan Schenkel by KNF, USMJ

_____

STEPHAN SCHENKEL
Special Agent
U.S. Department of Commerce
Office of Export Enforcement

Sworn to before me this 5th day of August, 2020 by reliable electronic means

*Kevin Nathaniel Fox*
_____
HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK